**In re William L. GRIVAS, Debtor.**

**Bankruptcy No. 87–01131–LM11.**

United States Bankruptcy Court,
S.D. California.

Oct. 24, 1989.

---

Hill & MacKinnon, San Diego, Cal., Cappello & Foley, Santa Barbara, Cal., for debtor.

Milberg, Weiss, Bershad, Specthrie and Lerach, San Diego, Cal., Sp. Litigation Counsel in Lender Liability Action.

Daughton Hawkins & Bacon, Phoenix, Ariz., Sp. Litigation Counsel in Lender Liability Action.

Lillick & McHose, San Diego, Cal., for Sec. Pacific Bank.

Greenberg and Bass, Encino, Cal., for Official Creditors' Committee.

Edward Infante, San Diego, Cal., U.S. Trustee.

## MEMORANDUM DECISION

LOUISE DeCARL MALUGEN,
Bankruptcy Judge.

What's in a name? That which we call a rose
By any other name would smell as sweet.
Shakespeare, *The Tragedy of Romeo and Juliet*,
Act II, Scene II, 43:44.

Like a modern day Juliet, this Court must ponder whether that which we call a "settlement" in an application to employ special counsel is the same as that "settlement" embodied in a confirmed reorganization plan. Although the semantic construction may appear to be less ethereal than that engaged in by Juliet, the stakes are high. At issue is the entitlement of three law firms to fees in excess of $865,000.

## FACTUAL SUMMARY

Hill & Baskin are general counsel for William L. Grivas, an individual in Chapter 11 proceedings since February 1987. Shortly after the commencement of this Chapter 11 case, the debtor filed a lender liability lawsuit against Security Pacific National Bank ("SPNB"). The lawsuit alleged that SPNB's precipitous action in shutting down Grivas' line of credit a mere 45 days after commencing the lender-borrower relationship drove his successful electronics assembly business into Chapter 11 proceedings. To say that this litigation

and, indeed, every aspect of this Chapter 11 case, was fought with the ferocity of Armageddon is an understatement.

For a period of time, Hill & Baskin represented the debtor in both the Chapter 11 case and the state court lender liability action. Then, in September 1987, the debtor submitted his Application by Debtor–In–Possession to Employ Special Litigation Counsel and to Supplement and Modify Terms of Employment of Hill and Baskin. By that application, the debtor sought to employ Hill & Baskin, Milberg, Weiss, Bershad, Specthrie and Lerach ("Milberg, Weiss") and Daughton, Hawkins & Bacon (the "Daughton firm") as special litigation counsel in the lender liability action. The September 1987 application converted the debtor's representation in the lender liability action from a part-hourly, part-contingent arrangement to a full contingency basis, providing for a sliding scale contingent fee in the event of recovery.[1] The application further stated:

> (d) In the event of a settlement of all or any part of the Security Pacific litigation, special litigation counsel shall have the option of choosing to be paid either at their normal hourly rates or in accordance with the contingency fee basis as set forth above. (Application filed September 30, 1987, para. 11(d), p. 7–8.)

The Court approved this arrangement by order entered September 30, 1987 (the "September 30 Employment Agreement"), which in addition to authorizing the Milberg, Weiss and Daughton firms to be employed, modified and supplemented the original employment order of Hill & Baskin.

In October 1988, the debtor filed an Application by Debtor to Retain Special Litigation Counsel. The application recited that the Daughton firm had been forced to withdraw as special litigation co-counsel and the debtor wanted to substitute Cap-

pello & Foley, noted experts in lender liability litigation, for the now-disqualified Daughton firm. The application was made on terms similar to those employing Hill & Baskin and the Milberg, Weiss firm. The same sliding contingent fee scale was employed. In relevant part, the exhibit to the application further stated:

> For the purpose of this application and the debtor's agreement with special litigation counsel, the term "recovery" shall mean anything of value, including loans, deferred payment terms, merchandise credits, set-off rights, debt forgiveness, below-market interest and the like.
>
>     *     *     *     *     *     *
>
> (d) In the event of a settlement of all or any part of the Security Pacific litigation, special litigation counsel shall have the option of choosing to be paid either at their normal hourly rates or in accordance with the contingency fee basis set forth above. (Exhibit "A" to Application filed October 24, 1988, pp. 3–4).

The Court approved the retention of Cappello & Foley by Order entered October 25, 1988.

While the lender liability action raged in federal and state court (it was removed to federal court and remanded twice during its pendency) the Chapter 11 case became the battleground for competing plans of reorganization filed by SPNB and the debtor. It was SPNB's plan which creates this dispute over fees. That plan provided for SPNB to pay the estate's unsecured creditors $1.75 million plus pay all administrative expenses (including attorney's fees) and priority claims in full in exchange for compulsory dismissal of the debtor's lender liability action. Needless to say, the debtor vigorously opposed submission of this plan to the creditor body.

At a hearing held on approval of the disclosure statement for the SPNB plan,

---

1. The application stated:
   For that portion of any recovery obtained by the debtor constituting compensatory damages other than non-punitive damages, special litigation counsel shall be paid 33⅓ percent of the first $10 million of any recovery, 25 percent of the next $8 million of any recovery, and 20 percent of all amounts of any recovery in excess of $18 million. In addition, special litigation counsel shall be paid 40 percent of any recovery constituting punitive damages. (Application filed September 30, 1987, Par. 11(b), p. 7)

the debtor raised numerous arguments against a compulsory settlement, including the point that the bank's plan was not a "settlement" because the term "settlement" implied a consensual termination of the controversy. The bank countered with equally forceful arguments, including that contained in its Reply filed July 8, 1988, in which it stated:

> The *settlement* which is at the heart of the Joint Plan [2] is designed to achieve the principles and purposes of the Bankruptcy Code. [emphasis added] (Reply of Security Pacific National Bank filed July 8, 1988, p. 11, 11. 3–5)

The Official Creditors' Committee joined SPNB's argument stating:

> The debtor says that Section 1123 doesn't give this court any power to confirm a plan that provides for a settlement of the lender liability action, because the debtor is not a part of that settlement. It seems to me that would render meaningless and useless provisions in the Bankruptcy Code in Chapter 11 that can provide for compromises of disputed claims. It is clear from the cases cited by Mr. Morrison [SPNB's attorney] that time and time again the bankruptcy courts in confirmation hearings have settled claims over the objections of debtors and the equity security holders. (Transcript, Hearing re Approval of Debtor's and/or Security Pacific National Bank's Disclosure Statements, July 12, 1988, p. 73, 11. 21–25; p. 74, 11. 1–2)

Ultimately, the Court was persuaded by case authority cited by the Joint Plan proponents—namely, *Matter of Texas Extrusion*, 844 F.2d 1142 (5th Cir., 1988) and *Holywell Corp. v. Bank of New York*, 59 B.R. 340 (S.D.Fla.1986); *aff'd on other grounds* 820 F.2d 376 (11th Cir.1987)—that the Bankruptcy Code authorized the court to consider and, if appropriate, approve a plan proposing settlement of litigation over the debtor's objection. The Court approved the dissemination of the Disclosure Statement and Second Amended Joint Plan of Reorganization at the same time as the debtor's Amended Disclosure Statement and Second Amended Plan of Reorganization. Balloting was conducted and, when it became apparent that creditor support for the Joint Plan was overwhelming, the debtor withdrew his plan from consideration.

Because impaired classes (the debtor's insiders and the debtor as an equity holder) had rejected the Joint Plan which subordinated and provided nothing for their claims, the Court was nevertheless required to hold extensive confirmation hearings. Since the debtor claimed the value of the lender liability suit could be as much as $80 million and at best, the bank's plan was offering $3.25 million,[3] the Court was required to determine whether the Joint Plan was fair and equitable as to the impaired dissenting classes. The Court bifurcated the confirmation hearing into two parts: One part was a five-day summary jury trial or mini-trial held before an advisory jury for the purpose of determining the likely value of the lender liability action; the other part was a number of days reserved for court trial of the equitable defenses to the bank's counterclaim and an evaluation of the acceptability of the advisory jury verdict in the lender liability action, as well as remaining the confirmation issues.

When the advisory jury returned a $1.2 million judgment in favor of the bank and against the debtor on the counterclaim to the lender liability action, the confirmation scenario rapidly changed. The debtor and insider creditors withdrew their objections to the Joint Plan, the Joint Plan was modified to provide for some of the insider creditors to participate pro rata in distribution with other unsecured creditors, the plan proponents withdrew their objections to the debtor's exemption claims, letter agreements of settlement and mutual releases were executed by the bank, the OCC and the debtor. The Court was not required to rule upon the equitable defenses, the acceptability of the advisory jury ver-

---

**2.** At some point the Official Creditors' Committee joined in the SPNB plan which then became known as the Joint Plan.

**3.** See, Debtor's Objections to Proposed Disclosure Statement Re First Amended Joint Plan filed July 6, 1988, p. 8, n. 2.

958

dict or any of the other confirmation issues reserved for the second part of the bifurcated confirmation hearing. Instead, an order confirming the modified Joint Plan was entered after a brief hearing.

However, predictably for this case, this was not the end of the dispute. When debtor's special litigation counsel applied for fees on an hourly basis in reliance upon the above-quoted sections of the orders approving their employment, the bank opposed an award in any amount, arguing, "counsel's request to be paid for any legal fees in connection with the lender liability lawsuit should be denied." Vol. I, Objections of SPNB to Final Fee Application of Hill and Baskin ("SPNB Objections") filed May 24, 1989, p. 52, 11. 6–8. SPNB also attacked the reasonableness of the fees requested by special litigation counsel.

## DISCUSSION

SPNB's position that the lender liability counsel of the debtor should be denied all legal fees is predicated primarily on three grounds:

I.  That the meaning of the term "settlement" as used in the September 30 Employment Agreement is different from that used in the Joint Plan and does not entitle special litigation counsel to apply for hourly compensation.

II.  That the settlement contained in the confirmed Joint Plan did not benefit the debtor but only the debtor's estate, and therefore the debtor recognized no "recovery" which would entitle special litigation counsel to request fees.

III.  That the fees requested by special litigation counsel are "unreasonable, unnecessary, inadequate, inefficient and not cost effective." (Vol. I, SPNB Objections, p. iii, 11. 23–4)

I.

■ Any resolution of this dispute must begin with the terms of the contract which is the genesis of that dispute; namely, the September 30 Employment Agreement. In interpreting this contract, we are bound by the law of the State of California. *Erie*

*R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

Three rules contained in the California Civil Code governing the interpretation of contracts in California are particularly helpful in this effort:

CC SECTION 1638. ASCERTAINMENT OF INTENTION; LANGUAGE

*Intention to be ascertained from language.* The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.

CC SECTION 1639. ASCERTAINMENT OF INTENTION; WRITTEN CONTRACTS

*Interpretation of written contracts.* When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title.

CC SECTION 1644. SENSE OF WORDS.

*Words to be understood in usual sense.* The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in the technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.

SPNB urges that the September 30 Employment Agreement is ambiguous and/or susceptible to more than one reasonable interpretation. They cite to numerous instances, including Hill & Baskin's above-quoted argument that the bank's plan was not a "settlement", where the term "settlement" was used to imply a consensual agreement disposing of the lawsuit. Indeed, SPNB is correct that at various times Hill & Baskin disagreed with SPNB that the Joint Plan was a settlement and said so vigorously in their opposition.

However, SPNB's leap to the conclusion that the Court needs extrinsic evidence of the intent of the parties does not necessarily follow from this concession. For one thing, the parties to the September 30 Employment Agreement—Grivas on the one

hand and the special litigation counsel on the other—are not in dispute. Although California has purportedly, "... turned its back on the notion that a contract can ever have a plain meaning discernible by a court without resort to extrinsic evidence," [4] the Court can find no case in which the doctrine enunciated by *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968) was used to permit consideration of extrinsic evidence where the parties to the contract had no dispute over the interpretation of the contract language.[5] Nor has SPNB cited any such authority.

Further, SPNB has introduced no evidence to suggest that the special litigation counsel and Grivas disagree over the terms of the September Employment Agreement. Even if the bank had such evidence, it is questionable whether, absent a dispute between the parties to the contract, the Court could consider extrinsic evidence of their intention offered by a stranger to the contract.[6] Therefore, the Court is returned to Civil Code Sections 1638, 1639 and 1644 in analyzing the meaning of the words used in the September 30 Employment Agreement.

Paragraph 11(d) of that agreement affords the special litigation counsel an option of being paid at a normal hourly rate rather than on a contingency fee basis, "... in the event of a settlement of all or any part of the Security Pacific litigation,...." Cal.Civ.Code Section 1644 directs that the words of a contract are to be understood in their ordinary and popular sense. The term "settlement" implies a termination or avoidance of all or part of a lawsuit. *Gorman v. Holte*, 164 Cal.App.3d 984, 988; 211 Cal.Rptr. 34 (2d Dist.1985).

In interpreting Paragraph 11(d) of the Agreement, the Court must be guided by the standard of reasonableness:

The standard for our ... interpretation of the clause is reasonableness. Cal.Civ. Code Section 3542 (West 1964) provides: "Interpretation must be reasonable." [citations omitted] *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1443 (9th Cir.1986).

Can the confirmation of the Joint Plan which compromised the lender liability action reasonably be considered a "settlement"? It is apparent that SPNB always considered it a "settlement". We start with the quoted text of the July 8, 1988 SPNB Reply, *supra*, herein at p. 5. Further, the Disclosure Statement Re Second Amended Joint Plan of Reorganization filed November 7, 1988 and approved for distribution to creditors by this Court finds SPNB making the following statements about the Joint Plan:

Security Pacific National Bank ("Security Pacific") and the Official Creditors' Committee ("OCC") (collectively referred to herein as the "Proponents") have filed a Second Amended Joint Plan of Reorganization (liquidation) (the "Joint Plan" or "Plan") as an offer to fully and finally settle all claims by Security Pacific against the debtor and debtor-in-possession and to fully and finally settle all claims by the Debtor and Debtor–In–Possession against Security Pacific.... (p. 2, ll. 12–19)

\* \* \* \* \* \*

At the heart of the Joint Plan is a Settlement Payment by Security Pacific.... This fixed sum is not an admission of liability or responsibility but is a "cost of defense" only.... (p. 6, ll. 14–20)

\* \* \* \* \* \*

---

**4.** *Trident Center v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 568 (9th Cir.1988).

**5.** *Pacific Gas* rejected the proposition that extrinsic evidence was inadmissible to vary the terms of a written instrument which was plain and unambiguous on its face, reasoning, "if words had absolute and constant referents, it might be possible to discover contractual intention in the words themselves and in the manner in which they were arranged. Words, however,

do not have absolute and constant referents." 69 Cal.2d at 38, 442 P.2d 641, 69 Cal.Rptr. 561.

**6.** Were SPNB to offer such evidence, it could only do so on the theory that the words used in the contract had some objective meaning apart from the parties' intentions; that is, that the words used had a meaning different from the terms which the parties themselves used to their satisfaction. This is precisely the theory rejected by *Pacific Gas.*

The Lender Liability Litigation against Security Pacific National Bank, presently pending in the San Diego County Superior Court as Case No. 582942. The Plan provides that this action will be settled and dismissed with prejudice. (p. 72, 11. 11–15)

The Second Amended Joint Plan of Reorganization likewise discussed SPNB's proposal in terms of a "settlement":

> (c) *Settlement Payment by Security Pacific*
>
> All Claims by Security Pacific against the Debtor and Debtor–In–Possession, and all claims of the Debtor and Debtor–In–Possession against Security Pacific, including but not limited to the Lender Liability Lawsuit, shall be deemed settled pursuant to Bankruptcy Code Section 1123(b)(3)(A) and dismissed with prejudice. (p. 30, 11. 6–12)

When the advisory jury verdict precipitated a withdrawal of the debtor's opposition to the Joint Plan and modifications to the Joint Plan, the Joint Plan proponents and the debtor compromised their differences. A letter agreement of settlement was entered into by SPNB, the OCC and Grivas on or about January 27, 1989, and modified slightly on January 30, 1989. The letter settlement agreement provided:

> Concurrently therewith, the Bank shall dismiss ... *with prejudice* its Cross–Complaint in the Lender Liability Action which is to be dismissed without prejudice pursuant to the Joint Plan. (Letter, January 30, 1989)

Although SPNB carved out a reservation as to resolution of the attorney fee issue now presented by these objections, the letter agreements are so clearly settlements as to make an argument to the contrary border on frivolous.

Then, the parties circulated a Notice of Intent to Seek Entry of an Order Approving Settlement Agreement between the Official Creditors' Committee, Security Pacific National Bank and the debtor, William L. Grivas ("Notice of Intent") to all creditors. The Notice of Intent stated, *inter alia:*

> The OCC, the Bank and Grivas believe that approval of the settlement agreement is in the best interest of the estate. They note that the settlement agreement removed all impediments to swift confirmation, and that it has already substantially reduced and will continue substantially to reduce expenditures of attorney time and fees by, among other things, substantially reducing the length and scope of the confirmation hearing; eliminating possible appeal; and eliminating pending litigation regarding the debtor's claimed exemption for lost future earnings, objections to the claim of SGI Phoenix, and equitable subordination of the claim of SGI Phoenix. (p. 3, 11. 22–27)

The Court approved the settlement and mutual releases were executed.

Finally, the most recent and, perhaps, most telling, characterization of what occurred is from the mouths of SPNB's lead counsel, Kenneth R. Chiate and Robert L. Morrison, who co-authored a brief article entitled "California Advisory Jury Finds No Lender Liability Claim And Awards Lender $1.2 Million In Fees" in the August 1989 *Lender Liability Law Report:*

> Under the plan, the creditors would receive about $0.70 on the dollar for their claims, but there would be nothing left for the debtor. The plan also required the dismissal of the lender liability case. In reality, the joint plan was a settlement of the debtor's lender liability claim against the bank in which the bank was contributing approximately $2 million toward the plan. (Volume 3, No. 2, *Lender Liability Law Report,* p. 7–8)

It is against this backdrop of SPNB's usage of the term "settlement" that this Court rhetorically asks whether the Joint Plan can reasonably be considered a "settlement" of the lender liability litigation. The answer is obvious.

## II.

█ The second argument made against an award to special litigation counsel is that the settlement contained in the Joint Plan did not benefit the debtor, but only the debtor's estate. Therefore, in the absence of a "recovery" by the debtor, special litigation counsel are not entitled to any

fees. The argument makes much of the distinction between the terms "debtor" and "debtor-in-possession" as used in the Bankruptcy Code—a distinction with which no one quarrels. However, in the context of the September 30 Employment Agreement, it is a distinction without a difference.

The September 30 Employment Agreement is captioned "Application by *Debtor–In–Possession* to Employ Special Litigation Counsel and to Supplement and Modify Terms of Employment of Hill and Baskin" [emphasis added]. Throughout the application [which contains the infamous paragraph 11(d)] the terms "debtor-in-possession" and "debtor" are used interchangeably and synonymously. The order entered on the September 30 Employment Agreement likewise reflects the interchangeable use of the terms. The October 24, 1988 application which, in effect, substituted the firm of Capello and Foley for the Daughton Firm incorporates by reference the exact language of the September 30 Employment Agreement. The October 25, 1988 order authorizing Capello and Foley's employment likewise incorporates those terms as an exhibit to the order.

While the distinction between a debtor and a debtor-in-possession is important for some aspects of bankruptcy practice, with respect to the employment of counsel by the estate, it has none. There would be no point to counsel applying to be employed pursuant to 11 U.S.C. Section 327 if counsel were not looking to reimbursement from the estate for services benefitting the estate. And, as twice discussed by this Court in *In re Weingarden*, 84 B.R. 691 (Bankr.S.D.Cal.1988) and *In re Storms*, 101 B.R. 645 (Bankr.S.D.Cal.1989), in the context of a Chapter 11 case, reimbursement to counsel from the estate is dependent upon benefit to the estate and services benefitting only the debtor will not be recompensed by the estate.

To the extent that this semantic game-playing has raised any doubt in the parties'

minds as to the Court's intent in employing special litigation counsel, each order authorizing employment of special litigation counsel made the finding that the firms' employment was "in the best interest of this estate." Litigation counsel are employees of the estate and not the debtor, if that distinction in this context has any meaning.

## III.

◼ The final attack on the fees requested by special litigation counsel is on the reasonableness of those fees. The heading contained on page 126 of Volume I of SPNB's objections to the Hill and Baskin fee application summarizes their position: "General objections: Overstaffing, duplication and other miscellaneous overcharges." Although the objections address more than the fees requested by special litigation counsel, the Court will consider them only in the context of litigation counsel's fee request.[7] The thrust of SPNB's objections is to question the need for three separate firms to prosecute the lender liability action on the debtor's behalf. Had SPNB's defense of this allegedly meritless litigation been less aggressive, this Court would have likely agreed.

However, at the earliest stages of this case, SPNB made a tactical decision to engage the debtor on all fronts and the debtor responded in kind. The opening salvo was the combined hearing on SPNB's motion for relief from stay and the debtor's motion for use of cash collateral, filed within days of the Chapter 11 petition filing, and which ultimately consumed six days of evidentiary hearings for a debt of slightly more than $2 million. This was followed by an unremitting barrage of motion upon motion, deposition upon deposition, production request after production request in both the Chapter 11 case and the lender liability action. As the conflict escalated, each side peppered the other with personal

---

**7.** At the hearing held June 5, 1989, on the applications for compensation, the Court made an interim award to Hill and Baskin of fees for general bankruptcy representation of the debtor. The interim award was a percentage of the fees requested by Hill and Baskin with a retention sufficient to cover any adjustments necessitated by SPNB's objections to general counsel's representation. Disposition of those objections will be dealt with by separate opinion.

insults, invective and attacks which made dispassionate compromise virtually impossible.

The Court is dismayed but not surprised to learn that in the course of discovery in both actions the debtor produced over one million separate pieces of paper, representing almost all of its business records! SPNB produced 8,145 pages of documents, as well. [See Final Application of Capello and Foley, filed April 14, 1989, p. 7, 11. 6–9] Although this Court was not privy to every aspect of the lender liability litigation, in reading the voluminous fee applications and objections, responses and replies engendered by them, this Court has learned that at some point a private judge was hired to "referee" discovery disputes between the parties. The intensity of the conflict can be surmised from one revealing statistic: By June 1988, 15 months after the Chapter 11 filing, when the debtor sold his business and paid the principal and interest due SPNB in full, SPNB had already spent $1,459,300 in attorneys' fees alone on the bankruptcy and lender liability actions and was estimating another $1 million in anticipated fees and costs. (See Declarations of Robert L. Morrison filed June 13, 1988, p. 2, 11. 16–25 and Kenneth R. Chiate filed June 13, 1988, p. 3, 11. 7–9).

Although SPNB points to numerous hearings at which more than one attorney for the debtor was present, the Court's recollection is that SPNB routinely had at least two counsel present at hearings before this Court. Transcripts offered of hearings before the state court judge in conjunction with other aspects of this case corroborate this practice in the lender liability action as well. The June 2, 1989 response of Capello and Foley to SPNB's objections contains a plausible explanation for the practice on both sides:

> Like many firms, Capello and Foley employ a team approach to their cases and this was no exception. Under the team approach, different attorneys address certain portions of ongoing matters so

that work is distributed and shared and not duplicated. Unlike a large firm like Lillick and McHose, Capello and Foley does not and did not have the time to have two attorneys to perform the same job. (Capello and Foley's Response, filed June 2, 1989, p. 13, 11. 12–17)

SPNB's criticisms of duplication of services occasioned by Capello and Foley's late entry into the lender liability action after the Daughton [8] firm's forced withdrawal are satisfactorily answered by Capello and Foley's response:

> Capello & Foley replaced the firms of Bryan, Cave, McPheeters & McRoberts, and Daughton, Hawkins & Bacon, who were disqualified by the Bank and forced to withdraw due to a conflict with the Bank, respectively. Despite more than one-year's [sic] work on behalf of the Debtor, Bryan Cave has not sought compensation. Moreover, although the Bank knew of the grounds for disqualification, it delayed in asserting those grounds to the detriment of the Debtor. As a consequence, the Bank is actually saving money by not having to pay Bryan, Cave notwithstanding time incurred by Capello & Foley in becoming acquainted with proceedings it entered midstream. (Capello and Foley's Response filed June 2, 1989, p. 3, 11. 21–3; p. 4, 11. 1–8)

SPNB's remaining criticism of the litigation counsel's conduct of the lender liability action is directed to their refusal to agree to a moratorium on all discovery in the lender liability case after the Joint Plan was filed in June 1988. SPNB claims that debtor's special litigation counsel used the denial of its motion for stay to, "[run] up the lender liability fees and costs...." (Vol. I, SPNB Objections, p. 92, 11. 3–4.)

In defense of its opposition to a stay of discovery, debtor's counsel correctly points out that SPNB had no obligation to, "keep the settlement offer on the table ..." between the time it filed its Joint Plan and the time it went to the confirmation hearing. (Reply of Hill and Baskin, et al. to

---

8. The Daughton firm merged with the firm of Bryan, Cave, McPheeters and McRoberts during the litigation. The latter firm had had a client relationship with SPNB which caused the Daughton firm to be disqualified.

Objections of SPNB filed June 1, 1989, p. 41, 1. 1.) The confirmation hearing on the Joint Plan was not scheduled to begin until mid-January 1989, or conclude before the end of that month. The lender liability action was scheduled for a six to eight week jury trial in state court starting in April 1989. It would have been entirely possible for SPNB to withdraw its plan on the eve of confirmation and, instead, proceed with trial of the lender liability action after drawing the debtor into a false truce on discovery.

The effect of the debtor's dogged determination to bring the lender liability case to trial was undeniable:

> [N]o matter what the Bank says now, it was only litigation counsel's continued and vigorous prosecution of the lawsuit which ensured that the Bank's offer stayed on the table, and was not reduced or entirely withdrawn prior to confirmation.... Had discovery stopped, had the case ground to a halt, and had the litigation team turned to other endeavors, there is every reason to believe that the Bank's proposed settlement would have been reduced or withdrawn altogether. (Reply of Hill and Baskin, *et al.*, filed June 1, 1989, p. 23, 11. 2–6; 11–15)

> \*    \*    \*    \*    \*    \*

In summary, the Court finds the objections of SPNB to special litigation counsel's fees to be without merit. First, the language of the September 30 Employment Agreement and the mirror-image October 25 Employment Order is not ambiguous. That provision of those orders which entitles special litigation counsel to apply for compensation at their normal hourly rates in the event of a "settlement" was properly invoked when the lender liability action was settled through the confirmation of the Joint Plan. Second, that provision of the September 30 Employment Agreement which limited compensation to a "recovery obtained by the debtor" does not act to bar counsel's compensation on the theory that the recovery was one made by the debtor-in-possession and not the debtor. The employment orders are clear that special litigation counsel were employed by the estate; the record is clear that special litigation counsels' efforts precipitated SPNB's offer worth at least $3.25 million to the estate's administrative, priority and unsecured creditors.

Finally, the reasonableness of the debtor's special litigation counsel fees cannot be examined in the abstract. They were a reaction to aggressive and vigorous litigation by SPNB. While the Court does not condone the excesses in which both sides indulged, neither will the Court condemn and, in so doing, punish only the debtor's counsel for responses appropriate to the litigation hostilities engaged in by both.

Based on the foregoing, the Court makes the following awards of attorneys' fees and costs in accordance with their election to be paid at their normal hourly rates:

1. To Capello and Foley, for services rendered in the lender liability action and summary jury trial, the sum of $225,313.50, together with costs, including expense of expert witnesses, in the sum of $96,713.77.

2. To Hill and Baskin, for services detailed in category No. 3 of its fee application (Security Pacific litigation), the sum of $610,803 for fees, together with costs, including expense of expert witnesses, in the sum of $82,794.53.

3. To Milberg, Weiss, Bershad, Specthrie and Lerach, for services in the sum of $29,504.25, together with costs in the sum of $1,170.30.

The amounts awarded as costs by this ruling include those costs awarded on an interim basis by this Court's order of June 30, 1989 and July 7, 1989. To the extent the previously ordered costs have been paid, they should be deducted from the amounts awarded herein.

SPNB is directed to pay these fees and costs within ten (10) days of entry of an order in accordance with this Memorandum Decision. Sums remaining unpaid after that date shall bear simple interest at twelve (12%) percent per annum. Hill and Baskin are directed to prepare an order in accordance with this Memorandum Deci-

sion within ten (10) days from the date of its entry.